DONALDSON, Judge.
J.F. Ingram State Technical College (“the college”) appeals from the decision of a hearing officer overturning the decision of the acting president of the college to reassign Stanley Carter’s employment with the college. This proceeding is governed by the Students First Act of 2011 (“the SFA”), § 16-24C-16, Ala. Code 1975. The decision of the hearing officer was appealed directly to this court pursuant to § 16-24C-7(f), Ala. Code 1975. For the reasons discussed herein, we reverse the decision of the hearing officer and render a judgment in favor of the college.
*501 The college is a part of the Alabama Department of Postsecondary Education, but it operates within a correctional-facility environment. Carter has been employed with the college for approximately 25 years and had been employed as the dean of instruction for the college for 1 year, earning $112,000 annually. Pursuant to largely undisputed events discussed below, the college reassigned Carter to the position of center director. As a result of the reassignment, his annual salary was reduced to $96,803. Pursuant to subsections (e) and (f) of § 16-24C-6, Ala. Code 1975, which governs the demotion and/or termination of nonprobationary classified employees of two-year educational institutions, Carter appealed that decision.
On January 19, 2016, a hearing was held on Carter’s appeal before Dr. James S. Klauber, who, for the limited purpose of conducting a hearing in this matter, was acting as president of the college (“the acting president”). The acting president was appointed after Dr. Hank Dasinger, the actual college president, recused himself from the proceedings due to his involvement in the underlying investigation that led to Carter’s reassignment. Dr, Da-singer, Carter, and LaTonya Porterfield, an employee of the college, testified at the hearing.
On February 1, 2016, the acting president entered a written order, finding as follows:
“1. At the end of October and prior to October 27, 2015, President Dasinger received a report from employee Malinda Baynard that a male employee had taken pictures of a female employee. President Dasinger inquired further as to who the specific parties were and was informed it was Stanley Carter and LaKerri Gill. He was advised that LaK-erri Gill was very upset about the incident.
“2. On October 27, 2015, President Dasinger met with LaKerri Gill to discuss the reported allegations. Jon Klarren, Dean of Administration, also attended these meetings with the President and transcribed notes from this meeting.
“3. LaKerri Gill reported to President Dasinger that, about a month prior, she was with Stanley Carter, Lucian Ward, Alexis Owens, LaTonya Porter-field in a conference room. Stanley Carter made a comment about her wearing a full dress and he had made comments like that in the past. Stanley Carter took three photos of her with his cell phone, one of her legs, one of her middle, and one of her top. She felt ‘like a whore’ and ‘nasty.’ The incident was reported to Malinda Baynard.
“4. LaKerri Gill reported to President Dasinger that she was engaged in avoidance behaviors around Stanley Carter. Stanley Carter denied that LaK-erri Gill tried to avoid him.
“5. LaKerri Gill reported another picture-taking event by Stanley Carter that occurred around October 23, 2015, and she reported immediately walking out. There was no testimony contradicting a second picture-taking event.
“6. LaKerri Gill reported to President Dasinger that she had been cursed by Stanley Carter, T don’t want to hear that sh[i]t.’ There was no contrary testimony to this behavior.
“7. On October 27, 2015, President Dasinger met with LaTonya Porterfield to discuss the reported allegations. Jon Klarren, Dean of Administration, also attended with the President and transcribed notes of this meeting.
“8. LaTonya Porterfield reported to President Dasinger that she believed *502 Stanley Carter had taken pictures of LaKerri Gill and wondered why Stanley Carter would take a picture of LaKerri ; Gill and didn’t know what kind of relationship Stanley Carter and LaKerri Gill had.
“9. On October 27, 2015,-President Dasinger met with Lucian Ward to discuss the reported allegations. Jon Klarren,. Dean of Administration, also attended, with the President and transcribed notes of this meeting.
“10. Lucian Ward reported to President Dasinger that ‘several weeks ago’ Stanley Carter joked, about LaKerri Gill’s attire and took out his cell phone and took three pictures of LaKerri Gill starting with her legs, Lucian Ward reported the conduct to be strange but thought Stanley Carter, as an administrator, would -know, better than ho do something inappropriate. LaKerri Gill approached, him and was upset after-wards and.he cautioned her not to file a complaint.
“11. Based on the- report and .the three interviews conducted, on October 30, 2015, President Dasinger drafted a proposed suspension without pay and reassignment memorandum to Stanley Carter and also drafted a notice of voluntary resignation from. Dean of Instruction to Center Director position to discuss with Stanley Carter.
“12. The October 30, 2015, proposed memorandum noted that
“a. Stanley Carter was proposed for suspension for .15, work .days and the suspension was not subject to appeal; and
“b. Stanley Carter was proposed to be removed from his position as Dean of Instruction and reassigned and transferred to . a Center Director position (without supervisory responsibilities) and proposed to have his pay decreased to the Center Director salary because Stanley Carter ‘on at least two occasions, used a cell phone to take pictures of a female employee, to include photos of her from head to toe. Further, you made comments to this employee about her attire/appearance. Not only did your actions offend and cause extreme discomfort to this employee, but it also raised questions among employees who witnessed your behavior about the nature of your relationship with the offended employee. Regardless of your intention, -these actions subject the College to claims of hostile work environment and/or sexual harassment. Additionally, these actions are inconsistent with the values of the College and are completely unacceptable for a person in a leadership position of the College.’
“13.' President Dasinger stated that he presented Stanley Carter with this draft October 30,. 2015, memorandum and allowed Stanley Carter to take it home, but Stanley Carter testified that he did not -receive this memorandum until November 2, 2015, at a later meeting with the President.
“14. There is no dispute that President Dasinger met with Stanley Carter face-to-face on October 30, 2015.
“15. There is no dispute that, on October 30, 2015, President Dasinger orally notified Stanley Carter of the employee report that Stanley Carter had engaged in inappropriate picture-taking of a female employee, that the female employee was upset, and that others had witnessed the conduct.
“16. President Dasinger testified that Stanley Carter was offered an opportunity to provide argument or defense to his actions, Stanley Carter originally denied taking pictures but eventually admitted to ‘simulating’ picture-taking. Stanley Carter further dis *503 cussed his friendship with LaKerri Gill and that, because she was often sad, he told her she needed a man in her life and. showed her a male picture on his phone.
“17. President Dasinger testified-that he believed Stanley Carter had originally misspoken and/or was dishonest about his role in the alleged picture-taking incident during this meeting.
“18. Stanley Carter testified that he did not know who the alleged victim of the alleged picture-taking was, while the President stated that he expressly told Stanley Carter that the incident involved pictures of LaKerri Gill on- October' 30, 2015, Stanley Carter’s, testimony did not seem credible in light of the conversation he admitted haying with the President about the incident and admitting he ‘simulated’ picture-taking.
“19. Stanley Carter was allowed to think .about the matter over the weekend and return on November 2, 2015, around 1:00 pm or 2:00 pm to discuss the matter again with the President.
“20. On November 2, 2015, Stanley Carter arrived and announced that he intended to fight the President’s proposal. This was another face-to-face and scheduled, meeting with the President.
“21. There was undisputed evidence that Stanley ‘ Carter never asked for a lawyer or asked for more time (other than over the weekend, which he was given) to present evidence or argument related .to the 15-day suspension.
“22. The Students First Act (Alabama Code [1975,] § 16-24G-6{i)) provides: ‘An employee may be suspended for cause with or without pay on the written recommendation of the president of a two-year educational institution alone .... The suspension of a ... non-probationary employee for no more than 20 work days without pay is not a termination of employment that is subject to review under this chapter. Adequate notice of -the reason or reasons for the proposed suspension and an opportunity to present evidence and argument, either in person, or in writing, to the president of a two-year educational institution .with respect to the proposed action shall be afforded the employee before the imposition of the suspension.’
“23. On November , 2, 2015,- [President] Dafeinger recommended that Stanley Carter be suspended and transferred with a loss of pay. Stanley Carter signed the recommendation on that day. ..
“24. Stanley Carter was suspended for l5 work,days beginning November 2, 2015. .
“25. On November 5, 2015⅛ the College’s Senior Personnel Officer submitted a certified letter to Stanley Carter, [informing him] that he was being transferred to- a Center Director- position (without supervisory responsibilities) and proposed to have his pay decreased to -the Center Director salary because Stanley Carter ‘on at least two occasions, used a cellphone to take pictures of a female employee without her permission and further made comments to this employee about her attire/appearance, Not only did your actions offend and cause extreme discomfort to this employee, but it also raised questions among employees who witnessed your ..behavior about the nature of your relationship with the offended employee. These actions subject the College to claims of hostile work- environment and/or' sexual harassment. Additionally, these actions , are inconsistent with the values of the College and are completely unacceptable for a person in a leadership position of the College.’
. “26. Stanley Carter signed for certified. receipt of this November, 5 letter.
*504 “27. President Dasinger asked Jon Klarren, Dean of Administration, to interview two other employees, Hubert Griffin and Alexis Owens.
“28. President Dasinger received a report of those meetings on or about November 13, 2015. The report stated that Alexis Owens stated that at the end of September or early October, Stanley Carter commented that LaKerri Gill was dressed up and he was going to take a picture. LaKerri Gill indicated that she did not want her picture taken and then she left the room, after Stanley Carter held his camera up to take pictures.
“29. On November 17, 2015, Stanley Carter asked for a hearing, through legal counsel, and asked for ‘an additional short plain statement of the facts substantiating the charges brought against him ... ’
“30. On November 18, 2015, President Dasinger asked to be recused as the hearing officer in the Stanley Carter matter.
“31. On November 30, 2015, the Chancellor of the Alabama Community College System approved President Da-singer’s request to recuse and appointed Dr. James S. Klauber as the acting President of the College for the limited purpose of presiding over the Stanely [sic] Carter matter.
“32. On December 1, 2015, Acting President James S. Klauber submitted a notice of hearing setting the hearing for January 11, 2016, at 10:00 a.m. at the College.
“33. On December 11, 2015, due to Stanley Carter’s legal counsel’s request and new information, the Senior Personnel Officer supplemented the November 5, 2015, notice of proposed transfer and loss of pay.
“34. The December 11, 2015, letter stated the grounds for the transfer and loss of pay were based on misconduct, failure to perform your duties in a satisfactory manner, failure to properly respect female employees, and failure to act in a professional manner appropriate for a Dean, and other good and just cause.
“35. The December 11, 2015, letter further informed Stanley Carter that the proposed action was based on the fact that he did not speak truthfully to the College President when initially questioned about the event. He denied the picture-taking event occurred and [asserted that] employees lied about it, but later changed the story and admitted pretending to take pictures of LaKerri Gill. Stanley Carter denied lying.
“36. The December 11, 2015, letter further advised that the proposed action followed a previous warning where the College President discussed with Stanley Carter his lack of judgment involving female employees when he was behind closed doors with a female employee. Stanley Carter admitted that the College President discussed with him a problem with being behind closed doors with female employees.
“37. The December 11, 2015, letter further advised that the proposed action was based on Stanley Carter’s complete lack of understanding of the inappropriateness of his admitted actions.
“38. The December 11, 2015, letter further advised that the proposed action was based on Alexis Owens[’s] report that LaKerri Gill advised that she did not want her picture taken but that Stanley Carter pretended to do so anyway.
“39. The December 11, 2015, letter further advised that the proposed action was based on Stanley Carter’s cursing to LaKerri Gill and her reported attempts to avoid interactions with Stanley Car *505 ter. President Dasinger testified that LaKerri Gill reported this cursing incident. The report was not contradicted.
“40. The College has a code of conduct for employees which states that dishonesty, misrepresentation, and/or unduly offensive behavior which would be offensive to a reasonably sensitive person is deemed ‘misconduct.’ This policy also provides that the College has a commitment to ensure a non-harassment and respectful environment for all employees. Harassment is defined as ‘activity which has the ... effect of unduly demeaning, embarrassing, or discomforting any person ... of reasonable sensitivity.’ The policy also provides that ‘conduct may constitute sexual harassment when the allegedly harassed employee ... has indicated by his or her conduct that it is unwelcome and offensive.’
[[Image here]]
“45. Stanley Carter argues that there are no College policies which state that picture-taking is improper conduct. The College is not required to create policies for every conceivable actionable offense. An administrator of a College knows, or should know, that it would be considered unprofessional to simulate taking photographs of female employees, cursing employees, or telling female employees that ‘she needed a man in her life’ to be happy.
“46. Stanley Carter’s own admissions of his conduct appear to show harassing behavior against LaKerri Gill, which is a violation of College policy. His conduct appears to have had the effect of ‘unduly demeaning, embarrassing, or discomforting’ LaKerri Gill.
“47. Stanley Carter engaged in poor judgment in taking three photographs of a female employee and stating to that female employee that she needed a man in her life to be happy.
“48. Stanley Carter’s actions show risky behavior that could be a liability for the College.
“49. Stanley Carter exhibited a complete lack of understanding of the implications of his conduct at the hearing when testifying that he did nothing wrong.
“50. Stanley Carter argues that the proposed disciplinary action was too severe. Based on all of these reasons, it is my finding that the- proposed disciplinary action is appropriate and warranted.
“Based on the evidence presented at the hearing, as well as the demeanor and credibility of the witnesses, President James Klauber finds that the Senior Personnel Officer of the College met her burden of proof and established that Employee Carter failed to properly respect female employees, failed to act in a professional manner appropriate for a Dean, and other good and just cause (harassing a college employee). In my capacity as the acting President of J.F. Ingram State Technical College for the limited purpose of presiding over the Stanley Carter proceeding, I hereby approve and adopt the recommendation of the Senior Personnel Officer that Stanley Carter be transferred to a Center Director-like position at his previous C-1 salary effective as of the date of this Decision.”
On February 16, 2016, Carter submitted his written notice to the Alabama Department of Postsecondary Education, pursuant to § 16-24C-6(e), Ala. Code 1975, seeking review of the college’s decision. A hearing officer was appointed to hear the appeal. On June 8, 2016, after considering briefs and exhibits of the parties, the hearing officer entered an order finding, in part:
*506 “a. Even giving deference to the acting president’s findings,. Carter’s conduct did notarise to the level of ‘other good and just cause,’
“Because this personnel action is governed by the same standards as a termination, the College must establish and the president must find that the factual allegations against the employee rise to the level of one of the statutory causes for termination provided in Section 16-24C-6(a), Ala. Code ¡1975. The only statutorily-enumerated. cause' for termination or demotion found by the. acting president was ‘other good and just cause.’ The undersigned finds that the College did not meet its burden. The photography incident did not violate any criminal statute, did not violate an employer policy, did not constitute a tort, was not reported by Gill, was not .reported by an eyewitness to the incident, and Gill declined to file a formal complaint when later given the opportunity. .
“While this hearing officer, gives deference to. the acting president’s finding that the conduct was ‘unprofessional,’ it does not rise to the point of making Carter unfit to continue in his role, as Dean, or that his doing so would- interfere with the operation of the College, the standard that precedent has set for conduct to be ‘other good and just cause’ to terminate a tenured, .employee who is otherwise. performing his duties well. Therefore, the undersigned finds, as a matter of law, that his conduct did not .constitute ‘other good and just cause,’ and his demotion is therefore voided, “b. The College failed to meet its burden of proof.
“Because the College suggested no alternative, the undersigned adopts the burden of proof for the College suggested by Carter: ‘reasonable and substantial,’ as first stated in Tipton v. Bd. of Ed. of Blount Cty., 276 Ala. 571, 575, 165 So.2d 120 (1962). Using that as a guide, this-hearing officer has no choice but to find that the College, as a matter of law, did not meet its burden of proof.
“Section 16-24C-6(c), Ala. Code 1975, provides that, ‘[a]t the hearing, ... the senior personnel officer [of the college], based solely on the information provided by the recommending senior supervisor, shall bear the burden of proof with regard to disputed issues of material fact.’ Thus, this- hearing officer will consider only the testimony put forth by the College in evaluating whether or not it met its burden of proof.
“Dr. Hank Dasinger, the College’s President, was the College’s only witness. He was not present at either incident in question and his only information came as a result of conversations with third parties. There was no physical evidence of a photograph or video of the incident, There'were no affidavits or statements by the individuals present and no evidence on the state of mind of LaKerri Gill other than Dasinger’s testi-riiony of what she told him. The only evidence that Carter made the statement to Gill about her ^needing a man in her life’ was the hearsay testimony of Dasinger. The best evidence for all of the findings against Carter, testimony from Gill, was not solicited by the College. In fact, Gill was not the complaining witness at any stage of the investigation or proceedings. The only exhibits on the. relevant points were written compilations of hearsay, as discussed below. The hearing officer also finds persuasive the body of cases cited by Carter in his briefs that, while hearsay evidence is admissible in an administrative hearing such as this, it cannot form the entirety of the evidence against him.
*507 “In Tipton, ‘[t]he evidence was vague, general, inconclusive, flimsy, and much of it conclusions and hearsay,’ which led to the teacher’s termination being overturned. [276 Ala. at 576, 165 So.2d] at 124. The same was true in this case. By relying solely on the hearsay testimony of the lead investigator in the matter, the College introduced no legal, , reasonable, or substantial evidence to support the [acting president’s] findings of fact. Therefore, the acting president’s decision is reversed and Carter’s demotion is vacated. The same would be true under an arbitrary and capricious analysis, as the total absence of legal, non-hearsay evidence provides that the [acting president’s] findings were arbitrary by definition.
“c. The College’s Exhibits 2 and 5 were wrongly admitted.
“Carter’s challenge to the admission of the College’s Exhibits 2 and 5 is likewise sustained. Those exhibits are collections of notes taken during interviews held by Dasinger and John Klar-ren (whom Dasinger had assigned to conduct further investigation of the matter), The undersigned rejects the College’s argument that these exhibits were ‘business records’ for purposes of Rule 803(6), Ala. R. Evid. The documents were not prepared in the normal course of Dasinger’s and Klarren’s duties with the college, were prepared specifically for litigation, and were not created contemporaneously with the events described therein. Thus, even under an arbitrary and capricious analysis, the documents should not have been admitted to the;record.
“d. Carter’s proffered evidence regarding Gill’s employment record was arbitrarily excluded.
“Carter is also correct that the evidence he sought to introduce regarding the employment record of LaKerri Gill was wrongly excluded. As her hearsay statements were admitted into evidence through the testimony of Dasinger, her credibility became relevant. See Rule 806, Ala. R. Evid. It was also relevant in comparing and contrasting the punishment meted out to Gill and the punishment proposed for Carter, as the'acting president had full authority under the Students First Act to impose a lesser sanction than that proposed by the Senior Personnel Officer. Finally, Carter was charged with conduct ‘contrary to the values of the'college.’ Dasinger’s conduct in Gill’s case was relevant to establish those otherwise undefined values. Thus, the document -and testimony that Carter attempted to introduce were admissible for multiple'purposes, and it was arbitrary and capricious for the acting president to exclude them.
“e. The demotion- constitutes an arbitrary and capricious sanction.
“‘Under the arbitrary-and-capricious standard of review, if-a hearing officer determines that the sanction imposed by an employer is arbitrary and capricious, the hearing officer may remand the matter with instructions to the employer to impose a lesser penalty.’ Ex parte Lambert, [199 So.3d 761, 769] (Ala. 2015). “Even if the legal errors found above had not occurred, the undersigned would still find Carter’s demotion to be arbitrary and capricious based upon the facts of the case. In Lambert, the Alabama Supreme Court held that' a hearing officer could find that .the, employee’s punishment was arbitrary and capricious, and that is what the hearing officer did on remand.
“That precedent is persuasive and informs my decision in this case. Whereas the employee in Lambert violated a specific workplace -rule that dealt with *508 student safety, Carter’s conduct here implicated neither a workplace rule, nor student/employee safety. While the acting president found that there was a risk of liability to the College, none has occurred, as was the case in Lambert. Giving deference to the finding that Carter ‘engaged in poor judgment,’ the employee in Lambert did, as well. However, like Lambert, Carter had a long and distinguished career and a perfect personnel record before the incident in question, including a near perfect evaluation shortly before this incident. Thus, the undersigned finds that the punishment of a demotion, with a $15,200 per year loss of salary that will serve as a lifetime financial penalty due to Carter’s proximity to retirement, on top of the 15-day unpaid suspension that had already been imposed for the same conduct, to be arbitrary and capricious.” On July 15, 2016, the college timely filed
a notice of appeal directly to this court, pursuant to § 16-24C-6(f), Ala. Code 1975.
On appeal, the college argues that the hearing officer applied the wrong standard of review to the acting president’s decision. The college points to the following paragraph in the hearing officer’s order in support of its assertion that the hearing officer applied an incorrect standard of review:
“The SFA requires that the undersigned give deference to the acting president’s factual findings and to his decision on the punishment imposed. § 16-24C-6(e), Ala. Code 1975. However, as to conclusions of law, as an appellate tribunal, this hearing officer will review them on a de novo basis. See Calhoun Cmty. Coll. v. Hudson, [200 So.3d 1175] (Ala. Civ. App. 2015). Cf. Espinoza v. Rudolph, 46 So.3d 403, 412 (Ala. 2010).”
The college asserts that the SFA makes no distinction between the standard of review for findings of fact and the standard of review for conclusions of law and that the hearing officer incorrectly relied upon Calhoun Community College v. Hudson, 200 So.3d 1175, 1179 (Ala. Civ. App. 2015), in employing a “bifurcated standard of review.” In Calhoun, we addressed the failure of a college president to issue subpoenas requested by an employee involved in proceedings governed under the SFA. We noted that § 16-24C-6(c), Ala. Code 1975, required the college president to issue the subpoenas upon a timely request. We held that “the arbitrary-and-capricious standard applies to the ultimate personnel decisions of the employer, that is, to the decisions regarding the proper action to take regarding a certain employee.” Id. at 1178. We also noted, however, that the SFA did not “requir[e] a hearing officer— or this court—to afford deference to an employer’s decisions regarding procedural matters such as the issuance of subpoenas.” Id. at 1179.
We are unable to discern from the hearing officer’s order in this case what “conclusion of law” was made by the acting president or how a de novo review was required.- The question whether Carter should have been reassigned is not a procedural question; rather, it is a substantive question to which the arbitrary-and-capricious standard of review applies. Our supreme court has explained that “the arbitrary-and-capricious standard of review ... applies to hearing officers’ review of employers’ decisions under the SFA.” Ex parte Lambert, 199 So.3d 761, 768 (Ala. 2015). “ ‘[I]t is well established[, however,] that where the issues involve only the application of law to undisputed facts appellate review is de novo.’ ” Ex parte Lambert, 199 So.3d at 765 (quoting Ex parte Soleyn, 33 So.3d 584, 587 (Ala. 2009)).
*509 The college also argues that, to the extent the hearing officer applied the arbitrary-and-caprieious standard of review, the hearing officer -failed to give due deference to the acting president’s decision, as required by the SFA. The college also asserts that the hearing officer failed to demonstrate that the acting president’s decision was arbitrary and asserts that substantial evidence supports the acting president’s decision.
“The arbitraiy-and-capricious standard is ‘ “ ‘extremely deferential,’ ” ’ prohibiting the reviewing hearing officer from substituting his judgment for that of the Board. [Ex parte Lambert, 199 So.3d 761, 767 (Ala. 2015)] (quoting Ex parte Dunn, 962 So.2d [814,] 816 [ (Ala. 2007) ] (emphasis omitted)). Put another way, ‘ “[w]here ‘reasonable people could differ as to the wisdom of [the Board’s] decision[,] ... the decision is not arbitrary.”” Id. (quoting Ex parte Dunn, 962 So.2d at 816). Traditional definitions of the terms ‘arbitrary’ and ‘capricious’ indicate that few decisions will be found to violate the standard.
“ ‘ “A decision is not arbitrary where there is a reasonable justification for the decision or where the determination is founded upon adequate principles or fixed standards.” Sexton v. Tuscaloosa County Civil Serv. Bd., 426 So.2d 432, 435 (Ala. Civ. App. 1983). “ ‘ “ ‘[A] decision is capricious if it is so unreasonable as to “shock the sense of justice and indicate lack of fair and careful consideration.” ”” ” Alabama Dep’t of Human Res. v. Dye, 921 So.2d 421, 427 (Ala. Civ. App. 2005) (quoting Westring v. James, 71 Wis.2d 462, 476-77, 238 N.W.2d 695, 702-03 (1976), quoting in turn Scharping v. Johnson, 32 Wis.2d 383, 390, 145 N.W.2d 691, 695 (1966)).
“Alabama Dep’t of Youth Servs. v. State Pers. Bd., 7 So.3d 380, 386 (Ala. Civ. App. 2008).”
Escambia Cty. Bd. of Educ. v. Lambert, [Ms. 2150548, Sept. 23, 2016] — So.3d —, — (Ala. Civ. App. 2016).[1]
. The acting president found that the evir dence presented to him established that Carter had “failed to properly respect female employees, failed to act in a professional manner appropriate for a Dean, and other good and just cause (harassing a college employee).” v The hearing officer found that “[t]he only statutorily-enumerated cause for termination or demotion [contained in § 16-24C-6(a), Ala. Code 1975, which is a part of the SFA], found by the acting president was ‘other good and just cause.’ ” The college asserts that the hearing officer,- rather than reviewing the acting president’s decision, “engaged in a patently improper re-evaluation of the weight and sufficiency of the evidence to find that the College did not meet its burden of proof in establishing ‘other good and just cause.’ ” The college asserts that the acting president, in finding that the college proved proper grounds for the demotion, provided a detailed articulation of the basis for his findings and of the evidence to support that decision. We agree.
“The term ‘other good and just cause’ refers to ‘ “any cause which bears a reasonable relation to the teacher’s fitness or capacity to discharge the duties of his position.”’” Bishop State Cmty. Coll. v. Thomas, 13 So.3d 978, 987 (Ala. Civ. App. 2008) (quoting Alford v. Ingram, 931 F.Supp. 768, 772 (M.D. Ala. 1996)). “Ac *510 cordingly, ... an employee who is. performing his or her job duties effectively may, nevertheless, properly be terminated from his or [her] employment if that employee has become unfit for continued employment or his or her retention would interfere with the building up or maintaining of an efficient school system.” Id. Dr. Dasinger testified that Carter’s actions had created an uncomfortable environment for the college employees and that Carter did not appear to appréciaté the inappropriateness of his actions. The acting president specifically noted that, during his tes-' timony, Carter “exhibited a complete lack of understanding of the implications of his conduct at the hearing when testifying that he did nothing wrong.” The acting president specifically found that Carter had been dishonest with the college president, had failed to respect female employees, had failed to act in a professional manner appropriate for a dean, and had harassed a college employee.' The acting president could have found that those circumstances constituted “other good and just cause” sufficient to support Carter’s transfér.
“The.Board, not the hearing officer, is the entity charged with making factual determinations and with determining the appropriate penalty for violations of its own policies. The hearing officer may reverse the decision of the Board and remand the matter for the entry of a lesser punishment only if the Board’s decision is arbitrary or capricious.” Escambia Cty. Bd. of Educ. v. Lambert, — So.3d at —. Because the acting president articulated reasonable justification for the decision to transfer Carter, and because those reasons are supported by the facts, the hearing officer exceeded his discretion by reversing the acting president’s decision. See id.; see also Sexton v. Tuscaloosa Cty. Civil Serv. Bd., 426 So.2d 432, 435 (Ala. Civ. App. 1983)(“A decision is not arbitrary where there is a reasonable justification for the decision or where the determination is founded upon adequate principles or fixed standards.”).
The college also challenges the hearing officer’s conclusion that the acting president incorrectly relied upon hearsay evidence and the decision that Exhibits 2 and 5 were not properly admitted and considered. The hearing officer found that,
“[b]y relying solely on the hearsay testimony of the lead investigator in the matter, the College introduced no legal, reasonable, or substantial evidence to support the [acting president’s] findings of fact. Therefore, the acting president’s decision is reversed and Carter’s demotion is vacated. The same would be true under an arbitrary and capricious analysis, as the total absence of legal, non-hearsay evidence provides that the [acting president’s] findings were arbitrary by definition.”
We note that the Alabama Rules of Evidence - apply to proceedings in Alabama courts. Rules 101 and 1101(a), Ala. R. Evid. The SFA does not include a provision requiring the application of the Alabama Rules of Evidence to administrative proceedings conducted outside court. Our supreme court has explained that
“administrative boards are not restricted to a consideration of evidence which would be legal in a court of law and may consider evidence of probative force even though it may be hearsay or otherwise illegal. Nonetheless, there must be sufficient legal evidence to support the order of an administrative board. If founded only on hearsay or other improper evidence, the decision of a board cannot be sustained. North Alabama Motor Express v. Rookis, 244 Ala. 137, 12 So.2d 183 (1943).”
Estes v. Board of Funeral Serv., 409 So.2d 803, 804 (Ala. 1982). Therefore, the hearing *511 officer’s application of the Alabama Rules of Evidence to the proceedings before the acting president is not supported by legal authority.
Nevertheless, even though the Alabama Rules of Evidence were not applicable, we observe that- the findings made .by the acting president in the written decision appear to be based on both hearsay and nonhearsay evidence. Dr. Dasinger, Carter, and Porterfield testified at the hearing. Porterfield testified that she had witnessed one of the events and indicated that she thought the situation was unusual. Carter testified that he had simulated taking Gill’s picture, which served as a basis for a finding that he acted improperly. Because Carter was a party to the proceedings, any statements attributed to Carter by others were not, by definition, hearsay. See Rule 801(d)(2), ’Ala. R. Evid. (an admission by a party opponent is not hearsay). See also II Charles W. Gamble and Robert J. Goodwin, MeElroy’s Alabama Evidence § 242.01(l)(e) (6th ed. 2009) (“[A]ll statements of a party opponent are admissible if offered against that party and if they are relevant.”). Therefore, even if the Alabama Rules of Evidence applied, Dr. Dasinger’s testimony regarding Carter’s statements was not hearsay.
Similarly, the hearing officer found that the acting president had wrongfully excluded Gill’s employment record, which Carter had sought to introduce, because, as the hearing officer determined, “[a]s [Gill’s] hearsay statements were admitted into evidence through the testimony of Da-singer, her credibility became relevant. See Rule 806, Ala. R. Evid. It was also relevant in comparing and contrasting the punishment meted out to Gill and the punishment proposed for Carter. ...” Specifically, Carter claims that the acting president should have considered whether the disciplinary action taken against Gill in an unrelated ■ proceeding was . disproportionately less than the disciplinary action taken against Carter.. We note that Carter served as the dean of- instruction, while Gill was a nonsupervisory employee. In his brief, Carter argues that “[t]he disparity between the punishments given to Ms. Gill and Dean Carter demonstrates the worldview that underlies the demotion of Dean Carter.”
■ Carter describes the decision of the college to prohibit his conduct, that was directed to a female employee as being too deferential to females and as “sexism wrapped in political correctness.” The legislature determined that a purpose of the SFA is to “[r]estor[e] primary authority and responsibility for maintaining a competent educational workforce to employers. ...”,§ 16-24C-2(2), Ala. Code 1976. It was for the college to determine whether Carter’s conduct was inconsistent with the workplace environment desired by the college in order to provide a competent educational workforce and, similarly, to determine whether Gill’s unrelated conduct warranted a lesser punishment. We must give deference to those decisions because, ultimately, in an SFA proceeding,
“[t]he Board’s decision [i]s due deference by the hearing officer. Although [the hearing officer] might ... disagree[] with the Board’s decision, the hearing officer [i]s not permitted to reweigh the testimony and to supplant the Board’s determinations regarding the facts .... Because the facts were such that they could be viewed differently by different persons, the hearing officer could not have determined that. the Board’s decision was arbitrary.”
Huntsville City Bd. of Educ. v. Jacobs, 194 So.3d 929, 942 (Ala. Civ. App. 2014). The proceedings before the acting president were not required to be conducted pursu *512 ant to the rules and procedures applicable in court proceedings, and much is left to the discretion of the employer in such proceedings (in this case, the acting president) regarding the evidence to be considered. We have not been directed to any authority supporting the conclusion that we could overturn the acting president’s decision not to permit the introduction of unrelated personnel decisions in this context.
Based on the extreme deference due the decision of the acting president, the decision to reassign Carter was not arbitrary and must therefore stand. Accordingly, we reverse the hearing officer’s decision and render a judgment reinstating the acting president’s decision.
REVERSED AND JUDGMENT RENDERED.
Thompson, P.J., and Pittman, Thomas, and Moore, JJ., concur.

. We observe that, with respect to the references in the quoted authority to "the Board,” the Board acted in the same capacity as the college president (or, in this case, the acting president) acts in the context of the administrative proceedings afforded for two-year educational institutions. See § 16-24C-3(5), Ala. Code 1975.